UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

FRONTIER-KEMPER CONSTRUCTORS, INC.,

            Plaintiff,

v.                                Civil Action No.: 2:06-0716

ELK RUN COAL CO., INC.,

            Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


            Pending are two motions for summary judgment, one by
plaintiff Frontier-Kemper Constructors, Inc. ("Frontier-Kemper")
and the other by defendant Elk Run Coal Company, Inc. ("Elk
Run"), both filed December 21, 2007.


I. Background


A. Formation of the Agreement


            This action arises from the construction of an
underground coal transfer shaft and coal storage bunker, also
called a glory hole, at Elk Run's Logan's Fork mine between the
Powellton and Eagle coal seams in which Elk Run, a subsidiary of

Massey Energy Company, and another Massey subsidiary were mining.
Frontier-Kemper is a construction company that was hired by Elk
Run to construct a shaft in the coal seams, using the raise bore
method.  Raise boring is a method for the construction of shafts,
"wherein a relatively small diameter pilot hole is drilled to the
depth of the bottom of the proposed shaft, a large diameter
drilling apparatus is attached to the drill rod at the bottom,
and the large diameter drilling apparatus is raised from the
bottom, creating the shaft as it drills upward." (Pl.'s Mem.
Supp. Mot. 2).

Elk Run initiated contact with Frontier-Kemper
regarding the raise bore project in March of 2005.  (Hank Depo.
27).  At that time, Elk Run sought only a rough budget estimate
and information regarding Frontier-Kemper's availability, which
Frontier-Kemper provided.  (Id.).  Elk Run next contacted
Frontier-Kemper in May of 2005, seeking a meeting with Del Brock,
manager of Frontier-Kemper's Mining Construction Division, to
discuss the project.  (Id.; Brock Depo. 25).

On May 27, 2005, Brock met with representatives of Elk
Run, including Barry Hale, Elk Run's president.  (Brock Depo.
25).  At this meeting, Elk Run's representatives explained that
they needed Frontier-Kemper to "drill an 1,100 foot pilot hole

2

through five abandoned mines, . . . and drill approximately 100
to 100 plus feet between two coal seams with two different
diameter shafts, starting out at a 20-foot diameter and then
drilling the remainder of the shaft at . . . ten feet." (Id. at
26).  Brock responded that Frontier-Kemper lacked the capability
to drill a pilot hole through abandoned mines, but that if Elk
Run drilled the pilot hole, Frontier-Kemper would complete the
raise boring.  (Id.).  Hale requested suggestions from Brock as
to drillers who may know how to drill through abandoned mines
inasmuch as Elk Run was unable to drill the hole itself.  (Id.).
Brock responded that he had never heard of drilling through
abandoned mines before and did not know of anyone who knew how to
do it, but suggested that Hale talk to Horn Drilling ("Horn") and
Ziegenfuss Drilling ("Ziegenfuss") as potential drillers for the
project.  (Id.).  Brock also told Hale that Frontier-Kemper
"would not take any responsibility for any of the pilot hole,"
and Hale agreed that Elk Run would "take all risk, whatever it
costs to drill the pilot hole."  (Id. at 27).

        Frontier-Kemper's chief estimator, Peter Hanke,
submitted a proposal on June 3, 2005.  (Letter, Jun. 3, 2005).
In this proposal Frontier-Kemper suggested that Horn would drill
the pilot hole, though Horn had not yet submitted a budget quote

3

to Frontier-Kemper.  (Id. ¶ 6).  As to the pilot hole, the
proposal provided:

> We propose to perform this work on a cost-plus basis
> since, as you know, it will not be possible to
> accurately estimate the costs due to the uncertain
> conditions.  We therefore included a budget cost of
> $410,000 as a below-the-line item which is a "best
> guess" at this stage.  This cost includes a 9% G&A and
> 6% profit component based on an estimated cost for Horn
> Drilling of $355,000.  Again, this will be adjusted
> based on actual invoices from Horn Drilling.  All other
> work will be performed at the prices shown on the bid
> schedule.

(Id.).  After this proposal was tendered to Elk Run, Horn
declined to drill the pilot hole, and in later revisions of the
proposal, Ziegenfuss was substituted as the subcontractor.
(Brock Depo. 27; Letter, Jun. 7, 2005).

        On June 15, 2005, Elk Run and Frontier-Kemper entered
into an independent contractor agreement ("Agreement") for the
raise boring project, the pertinent terms of which are set forth
below at pages 11 to 13.  On July 26, 2005, Ziegenfuss began its
work on the pilot hole.  (Pl.'s Graphic schedule of work on pilot
hole ("Pl.'s Graphic Schedule")).  According to the Construction
Schedule chart attached as Exhibit A to the Agreement, the pilot
hole was scheduled to have been completed by Ziegenfuss by July
28, 2005.  (Agreement, Exhibit A).  It was not completed until
October 29, 2005.  (Pl.'s Graphic Schedule).  Frontier-Kemper

4

began the raise boring thereafter and completed its portion of
the project on December 15, 2005, two months after the October
14, 2005 deadline set forth in the Construction Schedule chart.
(Def.'s Mem. Supp. Mot. 10).


B. Execution of the Agreement


        Ziegenfuss faced several challenges in drilling the
pilot hole.  The area in which the pilot hole was being drilled
is known as "crooked hole country" because holes drilled in the
Central Appalachian coalfields tend to deviate from the vertical.
(Williams Depo. 28).  Additionally, the pilot hole had to pass
through five vacant mines, and potentially could encounter five
voids, or open areas left after the coal had been removed and the
mine abandoned.  (Brock Depo. 25-26).  The voids posed a
challenge because the drilling equipment required a sealed column
of air from the drill bit back to the surface so that cuttings
produced in the drilling process could be blown back up to the
surface.  (Brock Depo. 18-19; Head Depo. 170-71).  Hitting a void
would create a loss of circulation as the column of air is
interrupted by the void.  (Brock Depo. 18-19; Head Depo. 170-71).
To deal with the voids, Ziegenfuss planned to carry casing behind
its drill bit so that the pilot hole could be encased as the

5

drill bit progressed downward.  (Brock Depo. 19-21).  As the drill bit reached a void, the casing would be put in place to isolate the void.  (Id.).

When the pilot hole reached a depth of 433 feet, the casing carried behind the drill bit became stuck, and it took approximately a week to dislodge the casing and remove it from the hole.  (Williams Depo. 27-29).  Shortly after the casing was removed from the pilot hole, the drill rig was blown from its foundation and had to be set back up, further stalling the progress of the pilot hole.  (Id. at 52-54).

Just beyond the first void and at approximately 500 feet, Frontier-Kemper's foreman, Sam Williams, proposed that the hole be measured in order to determine whether the hole was on an acceptable line.  (Williams Depo. 38).  Elk Run checked on the availability of a surveyor, but instructed Frontier-Kemper and Ziegenfuss to continue drilling because Elk Run did not want to wait for a surveyor.  (Id. at 38-39).  It was not until the drill reached the Powellton seam, which was the last of the five voids, that the hole was surveyed.  (Id. at 39).  At this point it was discovered that the hole had gone off line by approximately eight feet around the first void and was off line by thirty-five feet at the Powellton seam.  (Id. at 38-40).  This made the hole

6

unusable as a pilot hole for the glory hole.  (Persinger Depo. 71-72).

In order to remedy this situation, the hole was plugged with cement according to Williams' instructions.  (Id. at 73). However, the cement seeped out around the sides of the plug and into the mine, and a second plug had to be constructed.  (Id. at 75).  Another week was lost in cementing and re-cementing the hole.  (Williams Depo. 40-41).

After the hole was re-cemented, Brock recommended that a directional driller be employed to drill the pilot hole. (Williams Depo. 41-44).  A directional driller "has the capability, by virtue of the equipment it uses, to steer its drill."  (Mem. Supp. Def.'s Mot. 8).  Sedco Drilling ("Sedco"), a directional driller, was hired to drill a new pilot hole, which it did.  (Williams Depo. 42-43, 65).  However, Sedco's tools were not capable of drilling a hole large enough in diameter to meet Frontier-Kemper's needs to ensure that the raised bore equipment would operate properly, so it was understood that once Sedco drilled the pilot hole, the hole would have to be enlarged by Ziegenfuss.  (Id. at 42-43, 55-56; Brock Depo. 101).

While Ziegenfuss was reaming the hole drilled by Sedco,

it failed to use the proper length guide and it drilled out of the hole drilled by Sedco and into one of the previously drilled holes which had been plugged.  (Williams Depo. 65-66).  The hole had to be cemented a third time, and Sedco had to return to re-drill the pilot hole.  (Brock Depo. 104).

The pilot hole was finally completed by Ziegenfuss on October 29, 2005.  (Pl.'s Graphic Schedule).  Frontier-Kemper then mobilized its equipment to the site and completed the raise bore portion of the project, taking less time than estimated to complete that portion of the work.  (Brock Depo. 108). Nonetheless, Frontier-Kemper's portion of the raised bore project was not concluded until December 15, 2005, two months after it was scheduled for completion according to the schedule attached to the Agreement.  (Agreement, Exhibit A, Construction Schedule).

C. Events Giving Rise to This Action

Frontier-Kemper contends that it invoiced Elk Run for $1,382,050[1] for raise bore work done after the drilling of the pilot hole, which Frontier-Kemper notes is less than the amount due under the Agreement for this portion of the project.  (Mem.

---

[1] Dollar amounts are rounded to the nearest dollar.

Supp. Pl.'s Mot. 8-9).  According to Frontier-Kemper, Elk Run has
paid $628,680 for that work, leaving $753,370 unpaid.  (Id. at
9).  Frontier-Kemper also invoiced Elk Run $1,824,895 for the
pilot hole drilling.  (Id.).  This number represents the actual
amount Ziegenfuss invoiced to Frontier-Kemper plus a markup of 9%
for general and administrative costs and 6% profit for Frontier-
Kemper per the terms of the Agreement.  (Id.).  According to
Frontier-Kemper, Elk Run has paid $1,174,870 of that amount,
leaving a balance of $650,025 unpaid.  (Id.).  Additionally,
Frontier-Kemper contends that Elk Run has not paid an additional
$13,920 invoiced by Frontier-Kemper for extra work related to the
pilot hole.  (Id.).  Frontier-Kemper claims that the total amount
owed by Elk Run is $1,417,315.  (Id.).

Elk Run admits that Frontier-Kemper has submitted
invoices to Elk Run totaling $3,220,865 and that Elk Run has paid
Frontier-Kemper $1,803,550.  (Mem. Supp. Def.'s Mot. 4).  As Elk
Run relates it, that the amount paid to date equals "the quoted
price for the work performed by Frontier-Kemper [$1,393,550] and
the budgeted cost of the work performed by [Ziegenfuss]
[$410,000]," a total of $1,803,550.  (Def.'s Response 3).

Frontier-Kemper instituted this action against Elk Run
on September 15, 2006, alleging breach of contract, unjust

9

enrichment, and conversion.  Specifically, Frontier-Kemper claims
that Elk Run breached the payment terms of the agreement.
(Compl. ¶¶ 20-25).  Alternatively, Frontier-Kemper claims that
Elk Run, having received and retained the benefits of the glory
hole, must pay for those benefits under an unjust enrichment
theory.  (Id. ¶¶ 26-29).  Frontier-Kemper further asserts
alternatively a claim for conversion on the grounds that "Elk Run
has wrongfully accepted, has assumed dominion over, and exercises
the right of ownership over the constructed pilot hole,
underground coal bunker, and glory hole and the constituent goods
which went into their construction."  (Id. ¶¶ 30-34).

        Elk Run answered on October 11, 2006, counterclaiming
that Frontier-Kemper breached its obligation to timely complete
the raise bore project and breached a warranty relating to the
work of Ziegenfuss.  (Answ. ¶¶ 16, 23).  It seeks consequential
damages for cost overruns associated with the completion of the
glory hole, adjustment of its underground infrastructure, re-
engineering of fabricated steel associated with the transfer
station at the top of the glory hole, and lost profits associated
with reduced production caused by its inability to relocate and
operate its long wall machine pending completion of the glory
hole.  (Id. at 25).  As to Frontier-Kemper's breach of contract

10

claim concerning the payment terms, Elk Run responds that it is not responsible for those costs resulting from Ziegenfuss's poor workmanship. Finally, regarding Frontier-Kemper's claims of unjust enrichment and conversion, Elk Run contends that these claims cannot be sustained in the presence of a contractual relationship.

D. The Pertinent Terms of the Agreement

The Agreement provides that the "Contractor [Frontier-Kemper] shall perform the work set forth on Exhibit A (the 'Work')." (Agreement § 1.1.). As to the pilot hole drilling, Exhibit A provides in significant part:

> The bid schedule includes an allowance budget cost only for the pilot hole. (Contractor has contacted Ziegenfuss Drilling . . . whom Contractor believes has the equipment and method to drill the pilot hole. Note that the time which will be required to drill the hole will be approximately 20-30 days and the lead-time for purchase of the special casing needed may be up to 4 weeks. Contractor proposes to perform this work on a cost-plus basis since it will not be possible to accurately estimate the costs due to the uncertain conditions. Contractor therefore included a budget cost of $410,000 as a below-the-line item which is a "best-guess" at this stage. This cost includes a 9% G&A and 6% profit component based on an estimated cost for Ziegenfuss Drilling of $355,000. This will be adjusted based on actual invoices from Ziegenfuss Drilling.) All other work will be performed at the prices shown on the bid schedule set forth on Exhibit B.

11

(<u>Id.</u> at Exhibit A § 5).

As to payment, the Agreement states that the "Owner [Elk Run] will pay Contractor for the Work as set forth on Exhibit B." (Agreement § 3.1). Exhibit B is a schedule of rates for the work described in Exhibit A. It provides for a "TOTAL SHAFT BASE CASE (sic) PRICE" of $1,393,550. (<u>Id.</u> at Exhibit B). It further includes a single item, under the heading "BELOW-THE-LINE ITEMS," which is labeled "BUDGET FOR PILOT HOLE DRILLING 1,100 FT" at a sum of $410,000. (<u>Id.</u>).

The court notes that Elk Run relies on two additional sections of the Agreement in support of its contentions that time was of the essence and that Frontier-Kemper warranted the work of Ziegenfuss. Section 5 of the Agreement is titled "Method of Operations," and it provides that "Contractor shall promptly commence and diligently prosecute the Work in a safe, careful, skillful, efficient and workmanlike manner, in accordance with recognized modern methods and practices and in compliance with the timetable contained in any applicable Order." (<u>Id.</u> at § 5.1). Under section 12, entitled "Default," the Agreement provides "[i]f Contractor shall fail: to promptly commence and diligently prosecute the Work in a careful, skillful, efficient and workmanlike manner; . . . to timely complete the Work; . . . ,

12

then this Agreement and all of the rights of Contractor hereunder shall, in addition to all other rights and remedies of Owner pursuant hereto or at law or in equity at the election of the Owner, terminate and be forfeited." (Id. at § 12).

E. Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

II. Frontier Kemper's Breach of Contract Claim

The parties do not dispute that the payment terms of the Agreement are plainly set forth and that the Agreement as just above quoted is a cost-plus contract with respect to the drilling of the pilot hole. Frontier-Kemper contends that under the plain language of the Agreement, Elk Run agreed to pay the actual cost of the work performed by Ziegenfuss in drilling the

13

pilot hole, even if the actual amount exceeded the estimated cost, plus the contractually agreed upon markup.

As aptly noted by Elk Run, however, many courts have found implicit, in the terms of cost-plus contracts, limitations on the amount that may be charged by a contractor or sub-contractor as their actual cost of performing the work.  For example, in <u>Allen Co. v. Thoroughbred Motor Court</u>, 272 S.W.2d 343, 345 (Ky. 1954), the Kentucky Supreme Court held:

> It is true that the owner assumes certain risks under a cost-plus contract, such as increases in prices of materials and wages, damage to the structure from fire or wind, and possible error in estimating costs. However, we do not think the owner assumes the risk of careless or improper workmanship on the part of the contractor.

<u>Allen Co. v. Thoroughbred Motor Ct</u>., 272 S.W.2d 343, 345 (Ky. 1954); <u>see</u> <u>Lazovitz, Inc. v. Saxon Constr., Inc.</u>, 911 F.2d 588, 591-92 (11th Cir. 1990); <u>Hoggson Bros. v. Spiekerman</u>, 161 N.Y. Supp. 930 (1916); <u>Title Guar. & Trust Co. v. Pam</u>, 155 N.Y. Supp. 333 (1915).  The Oklahoma Court of Appeals has held "a condition is implicit in cost-plus contracts that the subcontractor owes the contractor a duty to make every reasonable effort to minimize the costs and thus may recover only for such material and labor which it is necessary to use to complete the job, absent of course, a contractual expression to the contrary.  <u>Metro. Elec.</u>

14

<u>Co., Inc. v. Mel-Jac Constr. Co.</u>, 576 P.2d 323, 325 (Okla. App.

1978).  The Louisiana Court of Appeal has noted:

> The contractor who is involved in a cost plus contract
> is under an obligation to see that the owner gets value
> received. . . .  The contractor must show that his work
> was performed efficiently and without the necessity of
> recurring remedial work suggestive of poor workmanship,
> so that the owner is not faced with excessive labor
> cost. . . .  Therefore, when there exists a contract to
> do a job for whatever it might cost, as in the case of
> a cost plus contract, it is implicit that the price
> charged will not be whatever the contractor sees fit to
> charge, but will be whatever may be shown to be a
> reasonable and proper cost.

<u>Joe Bonura, Inc. v. Hiern</u>, 419 So.2d 25, 29 (La. App. 1982)

(internal citations omitted);[2] <u>see</u> 13 Am. Jur. 2d <u>Building &</u>

<u>Construction Contracts</u> § 19; 17A C.J.S. <u>Contracts</u> § 386.

      The West Virginia Supreme Court of Appeals has not

passed upon the question of whether it will recognize an implied

requirement of reasonableness of the expenses paid and work

performed pursuant to a cost-plus contract.  The court must

determine whether the West Virginia court would likely impose

---

      [2] Frontier-Kemper challenges Elk Run's reliance on <u>Joe
Bonura</u> on the ground that it is based on Louisiana law which "has
grown from roots foreign to the common law heritage of her sister
states." (Pl.'s Response 5 (citing <u>Maher v. City of New Orleans</u>,
371 F.Supp. 653, 657 (D.C. La. 1974)).  While the court
acknowledges this important distinction, it finds the opinion in
<u>Joe Bonura</u> nonetheless persuasive inasmuch as it is consistent
with the opinions of courts operating under traditional common
law and does not conflict with any West Virginia law, as
discussed <u>infra</u> at pages 16 to 19.

such limits as other courts have done.  Of guidance is the West Virginia court's opinion in Gamble v. Main, 171 W. Va. 469, 300 S.E.2d 110 (1983).

In Gamble, the West Virginia Supreme Court considered whether to imply a warranty of habitability in the sale or construction of a new home by a builder-vendor.  Id. at 469.  In support of its conclusion that it should recognize such an implied warranty, the court relied on "the recognition that in a building contract there is ordinarily an implied warranty that the construction will be done in a workmanlike manner and, consequently, the doctrine of caveat emptor does not apply."  The court had again acknowledged the latter doctrine only the year before in Thacker v. Tyree, 171 W. Va. 110, 112, 297 S.E.2d 885, 887 (1982).  The court cited with approval the following passage from 3A Michie's Jurisprudence, Building Contracts § 4, stating:

> In building and construction contracts it is implied that the building shall be erected in a reasonably good and workmanlike manner and when completed shall be reasonably fit for the intended purpose.  Ordinarily a person undertaking a particular work impliedly agrees to exercise a degree of skill equal to the undertaking. So, in case a person holds himself out as specially qualified to perform work of a particular character there is an implied warranty that the work which he undertakes shall be of proper workmanship and reasonable fitness for its intended use.

Gamble, 300 S.E.2d at 113 (also citing Southern Erectors, Inc. v.

16

Olga Coal Co., 159 W. Va. 385, 223 S.E.2d 46 syl. pt. 5 (1976);

cf. W. Bateson & Co. v. Baldwin Forging & Tool Co., 75 W. Va.

574, 84 S.E. 887 (1915); 17A C.J.S. Contracts § 329 (1963)).

　　　　Frontier-Kemper contends, however, that Gamble is

inapplicable to the present case for at least two reasons, one of

which is that Gamble concerned the implied warranty of

habitability which exists only in residential construction

contracts.  (Pl.'s Response 5-6).  While the holding in Gamble

did concern the warranty of habitability, which has no

applicability to the mine construction at issue here, the portion

of the opinion relied upon by Elk Run concerns construction

contracts generally and is not limited to residential

construction.

　　　　Frontier-Kemper further contends that "the agreement to

a firm price is a prerequisite for the contractor's

responsibility to the owner for any costs added as the result of

a subcontractor's work."  (Pl.'s Response 3-4).  Citing Southern

Erectors, Frontier-Kemper asserts that because the pilot hole was

to be drilled on a cost-plus basis and not at a firm price, it

cannot be held responsible to Elk Run for any costs added as the

result of Ziegenfuss's work.  Southern Erectors, however, simply

holds:

17

> Where a contractor agrees to provide all work and
> materials in connection with a contract at a specified
> and firm price, in the absence of any express
> contractual agreement to the contrary, the contractor
> is responsible to the owner for any costs sustained by
> the owner which are occasioned by the acts of the
> contractor's irresponsible subcontractor.

Southern Erectors, 223 S.E.2d at 48 syl. pt. 5.  The court in

Southern Erectors did not go so far as to state or imply that the

contractor is responsible to the owner for any costs which are

occasioned by the acts of the contractor's irresponsible

subcontractor only when the contract is to be performed at a

fixed price.  It is observed that Southern Erectors was later

cited by the West Virginia Supreme court in Gamble in support of

the proposition that there is an implied warranty in a

construction contract that the construction will be done in a

workmanlike manner.  Gamble, 300 S.E.2d at 113.

　　　Inasmuch as the West Virginia Supreme Court, as in

Gamble, recognizes an implied warranty of fitness and workmanlike

quality in all construction contracts, the court believes that

the West Virginia court would also conclude that, under a cost-

plus construction contract, the owner is not responsible for

costs resulting from work that was not performed in a workmanlike

manner by the contractor or subcontractor.

　　　The court also finds support in the terms of the

18

Agreement itself that the parties intended that the work would be performed in a workmanlike manner.  As earlier noted, section 5 of the Agreement provides pertinently "Contractor shall promptly commence and diligently prosecute the Work in a safe, careful, skillful, efficient and workmanlike manner, in accordance with recognized modern methods and practices and in compliance with the time table contained in any applicable Order."  (Agreement § 5.1).  Section 12 of the Agreement provides "[i]f Contractor shall fail: to promptly commence and diligently prosecute the Work in a careful, skillful, efficient and workmanlike manner . . ., then this Agreement and all of the rights of Contractor hereunder shall . . . terminate and be forfeited."  (Id. at § 12).

Accordingly, if a portion of the Agreement was not performed in a "safe, careful, skillful, efficient and workmanlike manner, in accordance with recognized modern methods and practices" as required under the terms of the Agreement, then Elk Run is not responsible for costs resulting from that work which was not so performed.  Elk Run has submitted evidence suggesting that Ziegenfuss's performance was deficient and in violation of the Agreement.  Sam Williams, Frontier-Kemper's foreman, testified in his deposition that the American

Association of Drilling Contractors likely would not approve of
Ziegenfuss's method of running casing behind the drill bit and
that Ziegenfuss drilled out of the pilot hole drilled by Sedco
because Ziegenfuss used a guide of insufficient length.
(Williams Depo. 58-66).  John Head, Frontier-Kemper's expert
witness, testified in his deposition as follows:

> Q    Did you formulate an opinion as to whether those
>      plans [Ziegenfuss's plans] were reasonable and
>      appropriate for the geology involved here and the
>      nature of the project?
>
> A    The -- I did not review their plan in advance, but
>      the method that they employed in the project I
>      believe was inappropriate.
>
> Q    In --
>
> A    Inappropriate.  Was not appropriate for the
>      conditions that they were likely to encounter.
>
> Q    And why is that?
>
> A    The most serious concern in this case was always
>      going to be the potential for loss of drilling
>      circulation fluids when the mine voids were
>      encountered, and I believe that the technique that
>      Ziegenfuss employed, driving a casing down
>      immediately behind the drill with no ability to
>      pull the drill back up through the casing,
>      probably contributed to that casing getting stuck
>      as it eventually did just above the initial mine
>      void.
>
> Q    Any other aspect of the methodology employed by
>      Ziegenfuss that you found to be inappropriate?
>
> A    The other issue of concern for me was the
>      inadequacy of the initial collar pipe, the initial
>      casing pipe that they used to start off the hole

20

with.  Apparently there was some serious
difficulties with some blowout past that initial
casing.  So they had to pull that initial casing
and reinstall much larger diameter casing
immediately at the start of the hole.

Q     Anything else about their methodology that you
found to be inappropriate?

A     Well, I think Ziegenfuss should have insisted upon
surveying of the hole as an integral element to
the actual drilling of the hole.

(Head Depo. 22-24).[3]  Frontier-Kemper neither contradicts this

evidence given by its own expert nor disputes that Ziegenfuss's

work was defective.  Frontier-Kemper only asserts that the pilot

hole was ultimately completed and that Frontier-Kemper's own work

concerning the raise bore portion of the project was completed in

compliance with the terms of the Agreement.  (Pl.'s Reply 9-10).

The court does note that, according to the testimony of Sam

Williams, Elk Run instructed Frontier-Kemper at one point to

continue drilling the hole past 500 feet without taking a survey,

and that it was around this point that the hole began to go off

line.  This circumstance needs to be explored by further factual

_____

[3] The court observes that Elk Run cites to the deposition of
its expert Mike Miller in further support of the contention that
"the equipment and methodology that Ziegenfuss employed in
performing that work was so deficient as to doom the project to
failure from the outset."  (Def.'s Response 4).  The deposition
of Mike Miller, however, was not attached to Elk Run's motion for
summary judgment, nor was it attached to any of Elk Run's
subsequent briefing, and thus the court is unable to consider it.

development concerning the significance of this decision and the authority of Elk Run to make such a decision for its contractor and subcontractor.  It is possible that this decision could affect the amount due to Frontier-Kemper by Elk Run, but such is unclear from the evidence presently before the court.

Based upon the evidence, the court observes that some of the work performed by Ziegenfuss may not have been performed in a "safe, careful, skillful, efficient and workmanlike manner, in accordance with recognized modern methods and practices" as specified under the terms of the Agreement.  Further factual development is necessary, however, concerning both the nature of Ziegenfuss's performance and the cost of the services which are chargeable to Elk Run for the completion of the pilot hole.

III. Elk Run's Counterclaim for Breach of Warranty

Elk Run contends that Frontier-Kemper expressly warranted the work of Ziegenfuss in the Agreement using the following language, "Contractor has contacted Ziegenfuss Drilling . . . whom Contractor believes has the equipment and method to drill the pilot hole."  (Agreement, Exhibit A § 5).  According to Elk Run, Frontier-Kemper thereby warranted that Ziegenfuss

22

actually had the equipment and the method necessary to complete
the pilot hole.  (Def.'s Mem. Supp. Mot. 15).  Frontier-Kemper
responds that this language does not create an express warranty,
and if it does, then the warranty is for nothing more than
Frontier-Kemper's belief at the time of contract formation.
(Pl.'s Response 10-11).

Whether this language creates an express warranty turns
on the meaning of the phrase "Contractor believes."  The word
"believe" can connote a number of different meanings.  Webster's
New Collegiate Dictionary defines the word "believe" as "to have
a firm religious faith . . . to accept trustfully and on faith .
. . to have a firm conviction as to the reality or goodness of
something . . . to hold an opinion . . . to consider to be true
or honest."  With the word "believe" having multiple meanings,
varying from an opinion to a firm conviction, the passage
employing the word "believe" is facially ambiguous.

Regarding summary judgment on a questions of contract
interpretation, the Fourth Circuit Court of Appeals has observed:

> A court faces a conceptually difficult task in deciding
> whether to grant summary judgment on a matter of
> contract interpretation.  Only an unambiguous writing
> justifies summary judgment without resort to extrinsic
> evidence, and no writing is unambiguous if "susceptible
> to two reasonable interpretations."  <u>American Fidelity
> & Casualty Co. v. London & Edinburgh Ins. Co.</u>, 354 F.2d

23

214, 216 (1965).  The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face.  If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis.  See Jaftex Corp. v. Aetna Casualty and Surety Co., 617 F.2d 1062, 1063 (4th Cir. 1980).  If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.  World-Wide Rights Ltd. Partnership v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992).

Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir. 1993).  "An ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact . . . [and] summary judgment is inappropriate."  Sempione v. Provident Bank, 75 F.3d 951, 959 (4th Cir. 1996).

        Inasmuch as the language alleged to create an express warranty is ambiguous on its face, the court must examine any evidence extrinsic to the Agreement that is probative of the parties' intent at the time the Agreement was formed.  Neither

24

party has discussed any such evidence in this context.  The court concludes that there remain issues of material fact concerning the interpretation of the language alleged to create an express warranty.

In addition to the express warranty just noted, Elk Run contends that Frontier-Kemper has breached an implied warranty. Elk Run relies on a provision in the Agreement under which it is specified that "[c]ontractor shall provide . . . services to include . . . design, engineering and construction of a coal bunker and glory hole at Owner's Logan's Fork Mine . . . ." (Agreement, Exhibit A).  According to Elk Run, Frontier-Kemper was thus as a design professional hired to prepare plans and, as such, has breached an implied warranty recognized by the West Virginia Supreme Court in Eastern Steel Constructors, Inc. v. City of Salem, that such plans were prepared with the ordinary skill, care, and diligence commensurate with that rendered by members of its profession and that such plans, if properly implemented, would achieve the intended result. (Def.'s Mem. Supp. Mot 14 (citing Eastern Steel Constr., Inc. v. City of Salem, 209 W. Va. 392, 394, 549 S.E.2d 266, 268 syl. pt. 9 (2001)).  Elk Run asserts that it was entitled to rely on the plans formulated, reviewed and approved by Frontier-Kemper to

25

construct the glory hole.  (Id.).  Elk Run offers evidence
tending to show that the method utilized by Ziegenfuss was
inappropriate and posits that because Frontier-Kemper approved
Ziegenfuss's plans, Frontier-Kemper breached an implied warranty.
(Id. at 15).

Frontier-Kemper responds that Eastern Steel
Constructors dealt with professional negligence and is
inapplicable because Elk Run's claim is contractual and not tort-
based.  (Pl.'s Response 11).  Although Eastern Steel Constructors
did concern professional negligence, the court nevertheless
found, by virtue of the "special relationship" between the
owner's design professional and the contractor, the existence of
an implied warranty.  Eastern Steel Constructors, 549 S.E.2d at
277.  In that setting, the court held that a design professional
providing plans and specifications for an owner impliedly
warrants to the owner's contractor relying thereon, even though
there is an absence of privity, "that such plans and
specifications have been prepared with the ordinary skill, care
and diligence commensurate with that rendered by members of his
or her profession."  Id.  The court thereby fashioned a remedy
designed to fairly meet the exigency of the quandary presented.

Although the Agreement provides that Frontier-Kemper is

to "design, engineer[] and construct[]" a coal bunker and glory
hole, the plan said to have been devised, whether by Frontier-
Kemper or Ziegenfuss, is not shown.  Rather, the work identified
by Elk Run as a plan subject to an implied warranty appears to be
Frontier-Kemper's selection of Ziegenfuss as a subcontractor whom
it believed had the "method" to drill the pilot hole.  The court
need not develop here a tort-based implied warranty claim as in
Eastern Steel Constructors nor need the court otherwise extend
the scope of that holding to this case.  The parties are bound by
the terms of their contract.  Consequently, Elk Run through its
own breach of contract claim may seek redress for the failure it
attributes to Frontier-Kemper.

        The court accordingly denies Elk Run's motion for
summary judgment on its warranty claim, both express and implied.


        IV. Elk Run's Counterclaim for Failure to Timely Complete


        Elk Run contends that time was of the essence in the
Agreement and that Frontier-Kemper breached this term of the
agreement by failing to complete the glory hole by October 14,
2005.  The West Virginia Supreme Court of Appeals has noted that
"[t]ime is often made the essence of a contract and if the

                            27

parties clearly so intend, by words or by action, it will be so regarded." Creasy v. Tincher, 154 W. Va. 18, 22, 173 S.E.2d 332, 334 (1970). "Where time is of the essence in the performance of a contract, a delay in performance beyond the period specified in the contract, unless caused by the other party or waived by such party, will constitute a breach of the contract." Elkins Manor Assocs. v. Eleanor Concrete Works, Inc., 183 W. Va. 501, 396 S.E.2d 463 syl. pt. 2 (1990).

"Whether or not time is of the essence of a contract is determined from the language used in the instrument and the circumstances surrounding it." Creasy, 173 S.E.2d at 334. "The principle (sic) object is to determine the intent of the parties." Id. Any words which show that the parties intended for time to be the essence of the contract will be regarded as making it so; the parties need not use the exact words "time is of the essence." Id. In Creasy v. Tincher, the West Virginia Supreme Court found that time was of the essence in a contract for the sale of land where the contract stated "[t]his sale is to be completed and all necessary papers executed and delivered within 90 days from the date of acceptance hereof by Seller," and where the circumstances surrounding the transaction, such as the seller's need to quickly consummate the transaction and the

buyer's request for an extension, indicated that the parties intended that time be of the essence.  Id. at 333.

Elk Run relies on a number of provisions of the Agreement in support of its position that time was of the essence.  As earlier noted, section 5 of the Agreement provides pertinently "Contractor shall promptly commence and diligently prosecute the Work . . . in compliance with the timetable contained in any applicable Order." (Agreement, § 5.1).  Section 12 provides "[i]f Contractor shall fail: to promptly commence and diligently prosecute the Work; . . . to timely complete the Work; . . ., then this Agreement and all of the rights of Contractor hereunder shall . . . hereto or at law or in equity at the election of the Owner, terminate and be forfeited." (Id. at § 12).  Finally, Elk Run notes that the construction schedule attached to the Agreement listed October 14, 2005 as the "Finish date." (Id. at Exhibit A).

Frontier-Kemper responds that time was not the essence of the contract and that such is evidenced by a number of inconsistencies in the contract concerning the time of performance. (Pl.'s Response 8).  Frontier-Kemper notes that paragraph 5 of Exhibit A to the Agreement, which describes the pilot hole drilling, provides that "the time which will be

29

required to drill the hole will be <u>approximately</u> 20-30 days."
(<u>Id.</u> (quoting Agreement, Exhibit A)(emphasis added by
plaintiff)).  Frontier-Kemper contrasts this with the time
allotted for the drilling of the pilot hole in the construction
schedule attached to Exhibit A, which provides only fourteen days
for drilling the pilot hole.  (<u>Id.</u> (citing Agreement, Exhibit
A)).  Frontier-Kemper also notes that while the Agreement
requires the contractor's work to be "timely," it provides no
definition of that term.  (<u>Id.</u>).  Further, section 5 of the
Agreement, which requires the work to be completed "in compliance
with the timetable contained in any applicable Order," does not
define the word "Order," nor does Elk Run identify any order with
which Frontier-Kemper has failed to comply.  (<u>Id.</u>).

     The court observes that in building and construction
contracts the time of completion is often uncertain because of
the existence of numerous variables outside of the control of the
parties, such as weather, the delivery of equipment and supplies
from third parties, and the performance of subcontractors on the
job.  See Richard A. Lord, <u>Williston on Contracts</u> § 46:7.
Frontier-Kemper and Elk Run expressly acknowledged such
variables, or in their words "uncertain conditions," in the
course of contracting on a cost-plus basis.  (Agreement, Exhibit

A § 5). The construction schedule attached to the Agreement refers to the dates generally as "milestones" and also as "early start" and "early finish." (Id., Exhibit A, Construction Schedule). The court notes as well that a lack of firmness in the finish date is indicated not only by the "approximately 20-30 days" for the drilling of the pilot hole but also the accompanying provision that "the lead-time for purchase of the special casing needed may be up to 4 weeks." All of these time periods as well as those in the construction schedule are within the overlay of section 2.1 of the Agreement where it is provided that "[t]he initial term of this Agreement shall be a period of six (6) months . . . ." The June 15, 2005, Agreement was, as noted, completed December 15, 2005. These factors, when combined, create a degree of ambiguity in the terms relating to timing. And so the court turns to extrinsic evidence in an effort to discern the parties' intent as to whether time was of the essence of the Agreement.

Frontier-Kemper has identified no extrinsic evidence relating to the issue of time. Elk Run relies on the testimony of Wayne Persinger, Elk Run's vice president, and Sam Williams, Frontier-Kemper's foreman, to suggest that the time of completion was essential inasmuch as Elk Run was planning to move a long

31

wall miner into the seam in which the glory hole was being
constructed.  (Def.'s Reply 13-14).

Wayne Persinger testified in his deposition that when
the parties met on May 27, 2005, before they entered into the
Agreement, they reviewed a schedule which set completion dates
for each phase of the construction.  (Persinger Depo. 48).
According to Persinger, the schedule informed those in attendance
that "this is what we need to get done in order for the long-wall
to come to Logan's Fork."  (Id.).  Persinger admits, however,
that he does not recall whether the dates were discussed as goals
or as "drop-dead dates."  (Id. at 49).  The court observes that
Persinger's testimony does not indicate that Elk Run communicated
to Frontier-Kemper that the long wall machine would sit idly if
the glory hole was not completed by a certain date.

Additionally, Sam Williams testified in his deposition
that, partway through drilling the pilot hole, Wayne Persinger
requested that Ziegenfuss switch from one to two shifts per day.
(Williams Depo. 24).  Williams further testified that the reason
Elk Run needed Ziegenfuss to switch to two shifts was that
"[t]hey wanted to speed up the operation and get their shaft done
and get production."  (Id.).  Williams explains that at the time
the request was made it was mentioned that Elk Run wanted to move

a long wall machine into the lower mine and that it needed the
project "to get finished in time to move the long wall." (Id. at
24-25).  Williams also acknowledges that Persinger told him then
that Elk Run would start losing coal production if the project
was not completed "in X amount of days." (Id. at 25).  However,
the conversation between Williams and Persinger occurred while
the construction of the glory hole was underway and after the
Agreement had been entered into, so it is of little probative
value with respect to the parties' intentions at the time of
contract formation.  Based upon the lack of evidence that is
probative of the parties' intent at the time of the contract's
formation, an issue of material fact remains concerning the
interpretation of the Agreement as to whether the parties
intended to make time of the essence.


   V. Unjust Enrichment, Conversion, and Punitive Damages Claims


          Elk run seeks summary judgment on Frontier-Kemper's
claims for unjust enrichment and conversion on the ground that
neither claim can be sustained in the presence of an express
contractual relationship. (Def.'s Mem. Supp. Mot. 18-19).  Elk
Run also seeks summary judgment on Frontier-Kemper's request for
punitive damages inasmuch as punitive damages are not recoverable

in breach of contract actions.  (Id. at 19).  Frontier-Kemper
fails to respond to Elk Run's legal contentions regarding any of
these claims, except to state in a footnote that "by focusing
here [in its motion for summary judgment and response to Elk
Run's motion for summary judgment] exclusively on the breach of
contract claim, Frontier-Kemper does not intend to abandon its
additional claims that do not sound in contract," and further
that "[s]hould Frontier-Kemper not receive summary judgment on
its breach of contract claims, those two additional alternatively
stated claims arising from these facts remain claims which
Frontier-Kemper intends to advance as alternative causes of
action."  (Pl.'s Response 12 n. 4).

        Inasmuch as the court has found the existence of an
enforceable, express contract, Frontier-Kemper cannot proceed
under the theory of unjust enrichment, or quantum meruit.  "The
principle underlying quantum meruit recovery 'is a contract
implied in law . . . based on the equitable doctrine that one
will not be allowed to profit or enrich oneself unjustly at the
expense of another.'"  Copley v. Mingo County Bd. of Educ., 195
W. Va. 480, 486, 466 S.E.2d 139, 145 n.17 (1995)(quoting
Associated Wrecking & Salvage Co. v. Wiekhorst Bros. Excavating &
Equip. Co., 228 Neb. 764, 424 N.W.2d 343, 348 (1988)).  Regarding

                              34

implied contracts, the West Virginia Supreme Court of Appeals has held that an express contract and an implied contract, covering the same subject matter, cannot coexist. <u>Case v. Shepherd</u>, 140 W. Va. 305, 311, 84 S.E.2d 140, 144 (1954).  If an express contract exists, an implied contract is precluded.  <u>Rosenbaum v. Price Constr. Co.</u>, 117 W. Va. 160, 165, 184 S.E. 261, 263 (1936). Accordingly, Frontier-Kemper's claim for unjust enrichment is precluded.

As to Frontier-Kemper's conversion claim, Elk Run contends that it is a tort claim, and as such, cannot be pursued alongside Frontier-Kemper's contract claim because it does not arise independently of the contract.  (Def.'s Mem. Supp. Mot. 19 (citing <u>Lockhart v. Airco Heating & Cooling, Inc.</u>, 211 W. Va. 609, 614, 567 S.E.2d 619, 624 (2002)).  The court addressed this issue in its January 24, 2007, memorandum opinion and order, holding, "Count III of the complaint [for conversion] may fairly be read to plead the tort claim of conversion separate and independent of the alleged contract."  Elk Run now offers the testimony of Tom Kilmartin, Frontier-Kemper's Rule 30(b)(6) witness, as evidence that Frontier-Kemper's claim for conversion does not arise independently of the contract.  When asked whether "all of the moneys that you [Frontier-Kemper] are claiming due

[are] moneys that the company deems to be due under the terms of this contract," Kilmartin responded, "I believe that is correct, yes." (Kilmartin Depo. 13). As earlier noted, Frontier-Kemper has not responded to this argument, nor has it offered evidence beyond its pleadings in support of its claim for conversion. Consequently, Frontier-Kemper's claim for conversion fails.

Finally, inasmuch as Frontier-Kemper's only remaining claim is for breach of contract, Frontier-Kemper is not entitled to punitive damages. Goodwin v. Thomas, 184 W. Va. 611, 614, 403 S.E.2d 13, 16 (1991)("generally, absent an independent, intentional tort committed by the defendant, punitive damages are not available in an action for breach of contract."); C.W. Development, Inc. v. Structures, Inc. of W. Va., 185 W. Va. 462, 466, 408 S.E.2d 41, 45 n.4 (1991); Horn v. Bowen, 136 W. Va. 465, 469, 67 S.E.2d 737 (1951).

## VI. Conclusion

Based upon the foregoing, it is ORDERED that Frontier-Kemper's motion for summary judgment be, and it hereby is, denied. It is further ORDERED that Elk Run's motion for summary judgment be, and it hereby is, granted as to plaintiff's claims

36

for unjust enrichment, conversion and punitive damages, and it is
otherwise denied.

     The Clerk is directed to forward copies of this written
opinion and order to all counsel of record.

     DATED:  July 23, 2008

     John T. Copenhaver, Jr.
     United States District Judge